TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
BRENT A. WHITTLESEY (Cal. Bar No. 73493)
Assistant United States Attorney
Asset Forfeiture Section
       Federal Courthouse, 14th Floor
       312 North Spring Street
       Los Angeles, California 90012
       Telephone: (213) 894-5421
       Facsimile: (213) 894-0142
       E-mail: Brent.Whittlesey@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>                 v.<br><br>$143,000.00 IN U.S. CURRENCY,<br><br>            Defendant. | No. 2:21-CV-03001<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br><br>21 U.S.C. § 881(a)(6)<br><br>[DEA] |

Plaintiff United States of America brings this claim against defendant $143,000.00 in U.S. Currency, and alleges as follows:

### JURISDICTION AND VENUE

1.   This is an *in rem* civil forfeiture action brought pursuant to 21 U.S.C. § 881(a)(6).

2.   This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395.

PERSONS AND ENTITIES

4. The plaintiff in this action is the United States of America.

5. The defendant in this action is $143,000.00 in U.S. currency ("defendant currency") seized by law enforcement officers from Alexander Nicolai Mitchel Matallana ("Matallana") and Yomary Cabral ("Cabral") on July 24, 2020, at the Los Angeles International Airport, One World Way, Los Angeles, California 90045.

6. The defendant currency is currently in the custody of the United States Marshals Service in this district, where it will remain subject to this Court's jurisdiction during the pendency of this action.

7. The interests of Matallana and Cabral may be adversely affected by these proceedings.

FACTS SUPPORTING FORFEITURE

8. On July 24, 2020, Drug Enforcement Administration ("DEA") Los Angeles International Airport ("LAX") Group 3[1] officers received information from agents at the John F. Kennedy Airport in New York, New York ("JFK") that Matallana was traveling on Delta Airlines flight number 659 from New York, New York[2] to Los Angeles, California. A DEA agent at JFK airport alerted the LAX Group 3 officers of an excess amount of U.S. currency in a black backpack and

---

[1] DEA Group 3 is a task force comprised of DEA special agents, Los Angeles County Sheriff Department deputies and detectives, Los Angeles Police Department officers and Los Angeles Airport Police Department officers (collectively referred to herein as "officers").

[2] Most major eastern cities, including New York, New York, are known consumer cities for controlled substances and Los Angeles, California is a known source city for the purchase of controlled substances.

2

a grey hard sided roller type suitcase in Matallana's possession. Upon questioning Matallana, who was traveling with Cabral, told the TSA agents at JFK that the currency was to make car deals in Los Angeles.

LAX Initial Encounter of Matallana

9. The DEA/LAX Group 3 officers identified Matallana on the jet-way as he deplaned from Delta Airlines Flight 659 in the LAX terminal. Matallana was carrying a black, medium sized nylon gym bag ("gym bag") and was rolling a grey, hard sided rolling suitcase ("grey suitcase"). Matallana was walking with Cabral. Cabral was carrying a black "IT" suitcase ("black suitcase"), a black "Nike" duffle bag ("duffle bag") and a black shoulder bag ("shoulder bag").

10. In the terminal, Officers Regan, Cruz and Spears approached Matallana and Cabral, without impeding their progress, identified themselves as law enforcement and asked Matallana if he would speak with the officers. Matallana and Cabral both agreed to speak with the officers, however, Matallana refused to provide a government issued identification card to confirm his identity. Officer Regan then began a consensual conversation with Matallana regarding the travel to Los Angeles.

11. Matallana told Officer Regan that he owns a car brokerage company and was in Los Angeles to contact fleet managers to establish contacts to buy and sell cars. Matallana said that he and Cabral were considering a move to Los Angeles and would look for a place to live. Matallana added that the airline tickets were bought two days before and that Matallana and Cabral would return to New York late on Tuesday, i.e. in four days. Officer Regan informed Matallana that the officers knew of Matallana's TSA encounter at JFK and asked

Matallana how much currency was in his luggage (i.e. the gym bag and grey suitcase). After Matallana refused to answer the question, Officer Regan told Matallana that the officers were aware that Matallana had told TSA at JFK that he carried about $100,000.00, and Officer Regan repeated the question. Again, Matallana refused to answer.

LAX Initial Encounter of Cabral

12.  Officer Cruz contacted Cabral. Cabral agreed to speak with Officer Cruz. Cabral said she was traveling with Matallana to Los Angeles for cosmetic surgery.

13.  Cabral was asked if anyone had given her anything to transport to Los Angeles, to which she responded, "No". Cabral stated that she packed her own bags, and that the black suitcase, duffle bag and shoulder bag in her possession were her only bags. Officer Cruz asked if there was anything illegal inside her bags or any large sums of money. Cabral said she did not possess anything illegal and she had $10,000.00 in her possession. Cabral gave consent to search the bags in her possession.

Dog Sniff in Terminal

14.  Officer Regan asked Matallana if he agreed to place the gym bag on the ground for a Los Angeles Police Department ("LAPD") K-9 canine to run a sniff search in the area of the gym bag. Matallana agreed and placed the gym bag on the ground. At about the same time, Cabral agreed to place her shoulder bag on the ground near the same area as the gym bag. Matallana and Cabral backed away from the gym bag the shoulder bag, and the grey suitcase which was in the same area, to let the LAPD handler and the canine into the area of the gym bag, shoulder bag, and grey suitcase.

Positive Canine Alert

15. LAPD Officer Brett Coffey and his K-9 "Zuke," a trained, state certified, narcotics detection canine, approached the gym bag, shoulder bag and grey suitcase that had been placed on the ground. K-9 Zuke alerted to the presence of the scent of a controlled substance emanating from the gym bag and the grey suitcase that were in Matallana's possession.

16. Officer Coffey assumed the responsibility of K-9 Zuke on January 22, 2019. K-9 Zuke has received over 320 hours of training and has successfully found over 1,200 training aids. K-9 Zuke alerts on the scent of narcotics in which he is imprinted on. His alert consists of physical and behavioral reactions that include a heightened emotional state in which he stares at the source of the scent and becomes very possessive of the area. K-9 Zuke will positively alert his handler to the scent of heroin, cocaine (base and powder), and methamphetamine. Officer Coffey and K-9 Zuke were first certified by the National Police Canine Association on April 30, 2019, and were each most recently certified on May 27, 2020.

Walk to the DEA/LAX Office

17. The officers reminded both Matallana and Cabral that they were not under arrest and asked if they would voluntarily walk with the officers back to the DEA/LAX office to conduct a thorough search of the gym bag, shoulder bag and grey suitcase, and to discuss the contents of the gym bag, shoulder bag and grey suitcase. Both Matallana and Cabral agreed and maintained possession of their bags while walking to the DEA/LAX office.

18. During the short walk to the DEA/LAX office, Matallana became belligerent and said that he had changed his mind with regard to consent to accompany the officers to the DEA/LAX office.

Matallana's belligerence increased so much, that for his safety and the safety of the officers, Matallana was handcuffed without further incident. Cabral remained calm and kept control of her luggage and bags. Both Matallana and Cabral were reminded a second time they were not under arrest. By the time Matallana arrived at the DEA/LAX office, he had calmed down, the handcuffs were removed. Officers separated Matallana and Cabral to conduct consensual conversations with each.

<u>DEA Office Interview with Matallana</u>

19.  Officers Regan and Cruz conducted the consensual conversation with Matallana. Officer Regan again reminded Matallana that he was not under arrest and had done nothing wrong. Matallana agreed to sign the consent to search form for the search of the gym bag and grey suitcase. Officer Cruz conducted a search of Matallana's gym bag and grey suitcase. Officer Cruz found and removed an unknown amount of U.S. currency (<u>i.e.</u> a portion of the defendant currency) held in two paper envelopes that were in a side zipper pocket of the gym bag. The currency appeared primarily to consist of $50 and $100 bills. Officer Cruz then searched Matallana's grey suitcase and found eight more similar paper envelopes containing U.S. currency (<u>i.e.</u> a portion of the defendant currency).

20.  When asked about the currency, Matallana said that all of the currency belonged to him and that he carried between $110,000.00 to $115,000.00 in the bags. Matallana added that Cabral carried another $54,000.00 in her bags. Matallana later recalled that some of the currency belonged to customers of his car business started in March 2020, but Matallana could not be specific about how much of the currency belonged to customers.

21. Matallana said he intended to use the currency to purchase cars for the auto dealership "GRADE A" auto that was formed in March 2020. Officer Regan asked Matallana if he had researched car dealers or made any prior arrangements to meet with any dealers or fleet managers. Matallana responded that he would make deals with any fleet manager for any make or model from dealerships. Matallana had no information, either on his cell phone, or in printed form, of any pre-arranged meetings with others or research to purchase cars.

22. Matallana then mentioned that in addition to meeting with car dealers, Matallana and Cabral came to Los Angeles to find a place they could move into, like a condo or an apartment. Later in the interview, Officer Regan asked Matallana to fill out a form that asked for a current address. Matallana provided an address in Bayside, New York. When Officer Regan asked Matallana to confirm that the Bayside, New York address was his correct address, Matallana told Officer Regan and Officer Cruz that Matallana and Cabral had just put a down payment on a "place" at a different address in Bayside, New York but could not provide the specific address. Officer Regan then asked Matallana why they would be looking for a condo or apartment in California if they just put money down on a "place" in New York, and Matallana had no answer.

DEA Office Interview with Cabral

23. Officer Spears conducted the consensual conversation with Cabral. Cabral agreed to sign the consent to search form for the search of her luggage.

24. Officers searched Cabral's duffle bag and discovered a black wallet containing an unknown quantity of U.S. currency. Officers also searched Cabral's black suitcase and located three Chase bank envelopes and one Bank of America envelope. Each envelope

was hidden inside a sock which was hidden inside four separate shoes. Each envelope contained an unknown quantity of U.S. currency (i.e., the remaining portion of defendant currency).

25. Cabral said that Matallana purchased round-trip tickets for the both of them two days prior, with plans to return to New York on Tuesday, July 28, 2020. Cabral said Matallana reserved an Airbnb for their stay but Cabral was unable to provide any details regarding the reservation. Cabral said she and Matallana were terminated from their jobs at an Acura dealership in New York the day prior because the owner of the Acura dealership believed that Cabral and Matallana were funneling customers to Matallana's newly established auto business. Cabral said she was employed at the Acura dealership for four years where she had an average annual salary of $52,000.00.

26. Cabral said there was $1,200.00 inside the duffle bag and $10,000.00 inside her black suitcase. Cabral explained the $10,000.00 inside the black suitcase was for her cosmetic surgery. Cabral said Matallana handed her the four envelopes as she was packing and directed her to place them inside the black suitcase. Cabral said she placed the envelopes inside socks belonging to Matallana and then placed them inside her shoes prior to departing to the airport.

27. Cabral said she and Matallana traveled to Los Angeles so that she could have cosmetic surgery. Cabral immediately recanted, saying that they traveled to Los Angeles to have a vacation. Cabral then said she and Matallana had plans to relocate to Los Angeles and may possibly look for property to purchase. Cabral was unable to provide any information regarding any potential property they planned to visit, and Cabral admitted that she had not contacted a realtor or realty company or property owner regarding a potential purchase or

lease.  Cabral then recanted her assertion that she and Matallana were moving to Los Angeles stating, she did not want to move from New York, and explaining that it would be too far from her parents.

28.  Cabral also said she had not made contact with a doctor or medical facility regarding cosmetic surgery.  Cabral said she did a "Yelp" search but nothing beyond that.  Cabral was not able to explain the necessity to travel to Los Angeles for cosmetic surgery.

29.  Officer Spears directed Cabral's attention to the four bundles of currency and suggested to Cabral that it appeared that Cabral had more than $10,000.00 in her possession.  Officer Spears asked Cabral if she could explain the discrepancy.  Cabral said, "No", and explained Matallana handed her four envelopes of money to put inside the black suitcase and that she believed it was $10,000.00.

30. Officer Spears asked Cabral if the money in the envelopes belonged to her.  Cabral said, "No", and then read, completed and signed a disclaimer of ownership of currency where she indicated the money belonged to Matallana.

31.  $103,000.00 in U.S. currency was located between Matallana's gym bag and grey suitcase (i.e., a portion of the defendant currency).  The currency consisted of 272 $50 bills and 894 $100 bills.

32.  $40,000 in U.S. currency was located in Cabral's black suitcase (i.e., the remainder of the defendant currency).  The currency consisted of 78 $50 bills and 361 $100 bills.

33.  These currency denominations are typically used by narcotics currency couriers.

## CLAIM FOR RELIEF

34. Based on the above, plaintiff alleges that the defendant currency represents or is traceable to proceeds of illegal narcotic trafficking or was intended to be used in one or more exchanges for a controlled substance or listed chemical, in violation of 21 U.S.C. § 841 et seq. The defendant currency is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the defendant currency;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) that this Court decree forfeiture of the defendant currency to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

DATED: April 7, 2021

TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Division

   /s/Brent A. Whittlesey
BRENT A. WHITTLESEY
Assistant United States Attorney
Asset Forfeiture Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, Christopher J. Regan, hereby declare that:

1. I am a Task Force Officer with the Drug Enforcement Administration.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Verified Complaint for Forfeiture is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed 04/07/2021, 2021 in Los Angeles, California.

CHRISTOPHER J. REGAN
Task Force Officer
Drug Enforcement Administration

11